AKL, Appellee,

v.

EL CHAFEHI, Appellant.

[Cite as *Akl v. El Chafehi* (1997), 120 Ohio App.3d 110.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–96–129.

Decided May 23, 1997.

*Pheils & Wisniewski* and *David R. Pheils, Jr.*, for appellee.

*Dixon & Dixon, Randall C. Dixon* and *David Klucas*, for appellant.

SHERCK, Judge.

This appeal arises from a Lucas County jury verdict in a breach of contract case. Because we conclude that the defendant failed to sustain his defense that the underlying contract was unenforceable because it was a marriage brokerage agreement, we affirm.

Appellant, Samir Moussa El Chafehi, is a medical doctor. A native of the country of Lebanon, appellant is now a United States citizen. Appellee, Mohamed Zein Akl, lives and works in Lebanon.

In the early 1990s, appellant and his acquaintances Ali Akl and Ali Ibrahim lived in Toledo, Ohio. Ali Akl and Ali Ibrahim were from the same Lebanese village.

In 1993, appellant experienced an acrimonious divorce. After the divorce, appellant commented that he admired the conduct of Ali Ibrahim's wife when compared to appellant's former wife. At trial, Ibrahim testified that appellant attributed these admirable qualities to Ibrahim's wife having been raised in a small Lebanese village.

In April 1994, Ibrahim prepared to leave Toledo to visit his native village. A week prior to departure, Ibrahim discussed his plan with appellant and Ali Akl. At that point, appellant decided that he too would visit Ibrahim's village. Ibrahim testified that appellant told him that the purpose of this visit was to "look for a wife and get married."

Appellant and Ali Akl departed for Lebanon approximately a week after Ibrahim. The two were met at the Beirut airport by appellee, who is Ali Akl's brother. Appellee took the pair to Ibrahim and Akl's home village.

There is conflicting testimony as to appellee's role in appellant's search for a bride. It is undisputed, however, that by appellant's second day in the village he had met and married Ghada, a daughter of the neighbor of Ali Akl's parents. This marriage, however, was short lived. Lebanese law apparently prohibits a wife from remarrying within ninety days of a divorce. Ghada had been divorced for less than the prescribed period, so appellant was forced to divorce her. Since appellant was not certain he would be able to stay in Lebanon long enough to complete the divorce, he gave appellee a power of attorney to act for him in completing the divorce from Ghada.

Ghada's father then suggested that appellant marry Ghada's sister, Rolla. Appellant and Rolla spoke about a possible marriage, but Rolla wanted time to consider the proposal. Appellant again executed a power of attorney to appellee which, under Lebanese law, would have permitted appellee to stand in for appellant should Rolla decide to marry after appellant left the country.

Later, appellant met Ali Akl's niece, Wissal. Marriage was again discussed, and appellee again agreed to act as appellant's substitute to marry Wissal after appellant departed Lebanon. Another power of attorney was executed.

After appellant returned to Toledo, Rolla declined his proposal. Wissal, however, accepted.

On May 19, 1994, appellee exercised the power of attorney appellant had given him and stood in for appellant in a marriage to Wissal. Appellee also arranged for Wissal's passport and flew with her to Cypress to acquire a visa from the American embassy. This trip was not successful because embassy officials required certain documents from appellant. Appellee and Wissal returned to Lebanon. Later, appellant agreed to meet Wissal in Cypress and appellee again accompanied her there.

In Cypress, appellant also encountered difficulty with the American embassy and was forced to remain there while original documents were couriered from the United States. During the intervening time, appellant suggested that he and Wissal live together as husband and wife. Wissal, however, refused, as she had apparently been instructed by her parents not to consummate the marriage until she was on American soil. According to appellee, Wissal's refusal angered appellant, who then left Cypress for the United States. Wissal and appellee returned to Lebanon, where, on appellant's instructions, appellee again acted as appellant's agent to obtain a divorce—this time from Wissal.

On the subject of money, appellee's and appellant's accounts of events are significantly divergent. Appellee testified that he made no monetary demands on appellant while appellant was in Lebanon. However, appellee testified, when he began to act for appellant in his divorce, remarriage and arranging for Wissal to come to the United States, he asked appellant to cover his expenses. According to appellee, appellant assured him that money should not be a consideration and agreed to compensate him for his efforts. Appellee testified that this all changed, however, after appellant's dispute with Wissal in Cypress. After that, appellant told appellee that, because he had not acquired a wife, he felt he owed no one any money and that if appellee wanted to be reimbursed he should collect from Wissal's father.

Appellee sued appellant for more than $23,000 in the Lucas County Court of Common Pleas. Appellant responded first by moving to dismiss the suit pursuant to Civ.R. 12(B)(6), arguing that any agreement between the parties was unenforceable as against the public policy prohibiting marriage brokerage contracts. Alternatively, appellant suggested if this was a contract it violated a statute of frauds. The trial court denied appellant's motion, and the matter proceeded to a jury trial.

At trial, appellee testified that he was not in any way involved in brokering a marriage for appellant and, in fact, was not even aware that appellant was seeking a bride until appellant married Ghada. Appellee said he did not introduce appellant to anyone and testified that he, in fact, was in another village at his teaching job during the days appellant spent in Akl and Ibrahim's village. Ibrahim and Ali Akl corroborated this testimony.

Appellant's testimony contradicted appellee's. According to appellant, appellee had introduced him to Ghada, Rolla, and Wissal.

On submission to the jury, the panel returned a verdict in favor of appellee. Appellant's trial motion for a directed verdict and a post-trial motion for a judgment notwithstanding the verdict were denied. The trial court entered judgment on the verdict. This appeal followed with appellant setting forth the following three assignments of error:

"Assignment of Error No. 1

"The trial court committed reversible error by denying appellant's motion to dismiss for failure to state a claim upon which relief can be granted.

"Assignment of Error No. 2

"The trial court committed reversible error by denying appellant's motions for a directed verdict.

"Assignment of Error No. 3

"The trial court committed reversible error by denying appellant's motion for judgment notwithstanding the verdict."

"In order to dismiss a complaint under Civ.R. 12(B)(6) for failure to state a claim upon which relief can be granted, after all factual allegations are presumed true and all reasonable inferences are made in favor of the nonmoving party, it must appear beyond doubt from the complaint that the * * * plaintiff can prove no set of facts warranting relief." *State ex rel. Neff v. Corrigan* (1996), 75 Ohio St.3d 12, 14, 661 N.E.2d 170, 173.

The standard for granting a directed verdict and a JNOV are the same. If there is sufficient evidence presented at trial by which reasonable minds could reach different conclusions on an essential issue, the matter must be submitted to the jury. *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraphs three and four of the syllabus.

All of appellant's assignments of error reduce to a single premise. Appellant insists that this is a suit over a marriage brokerage agreement and/or a contract "made upon consideration of marriage." As such, according to appellant, any contract or quasi-contract which may have arisen between the parties is wholly unenforceable either as against public policy or as a contract required to be in writing by Ohio's Statute of Frauds, R.C. 1335.05.[1] See *Finch v. Finch* (1860), 10 Ohio St. 501. In support of this contention, appellant focuses on the language contained in appellee's original complaint and initial demand letter, which refer to appellee as "arranging a marriage."

Appellant's first assignment of error, however, is not well taken, as appellee's properly amended complaint specifically disavows the existence of any marriage brokerage agreement. Therefore, assuming that factual allegation to be true, appellee would be entitled to relief.

Concerning appellant's second and third assignments of error, a trial court's decision to grant or deny a motion for a directed verdict or a JNOV is a question of law. It, nevertheless, necessarily involves a review and consideration of the evidence. *O'Day v. Webb, supra,* at paragraph three of the syllabus.

Before appellant is entitled to a directed verdict, there must be no evidence which would allow reasonable minds to conclude that the underlying transaction in this case was anything other than a marriage brokerage contract

---

1. R.C. 1335.05 provides, in part:

"No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, * * * nor to charge a person upon an agreement made upon consideration of marriage, * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."

and/or made upon consideration of marriage. In fact, the only evidence presented in support of appellant's propositions was the testimony of appellant. Appellee denied a marriage brokerage arrangement and testified that he was not even aware that appellant was seeking a bride until after appellant married Ghada. He also testified that he had nothing to do with the introduction of appellant to any of the women to whom appellant was married or "engaged." Ali Akl and Ibrahim also testified and said nothing to contradict appellee's testimony. Therefore, there was evidence of record by which reasonable minds could conclude that this was not a marriage brokerage contract.

 Regarding appellant's statute of fraud argument, we cannot see (absent clear evidence that this was a marriage brokerage agreement) how this is an "agreement made upon consideration of marriage" any more than hiring a minister to perform a wedding ceremony or retaining a caterer for the reception is made upon consideration of marriage. The evidence suggests that appellee performed substantial personal services for appellant in connection with his marriages and divorces. While these services may have been unnecessary had the marriages not occurred, it cannot be said that the marriages provided the "consideration" for these services. Accordingly, appellant's second and third assignments of error are found not well taken.

Upon consideration whereof, the court finds substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. It is ordered that appellant pay court costs of this appeal.

*Judgment affirmed.*

GLASSER and SHERCK, JJ., concur.

MELVIN L. RESNICK, P.J., dissents.